# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCOTT G. KORMOS and JORDAN KLEIN, On Behalf of Themselves and All Other Similarly Situated Stockholders of PLAYTIKA HOLDING CORP., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0396-SG |
| PLAYTIKA HOLDING UK II LIMITED, ROBERT ANTOKOL, and CRAIG ABRAHAMS, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 18, 2024
Date Decided: May 3, 2024

Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Christopher P. Quinn, and Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Ned Weinberger and Casimir O. Szustak, LABATON SUCHAROW LLP, Wilmington, Delaware; OF COUNSEL: Jeremy S. Friedman and David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; John Vielandi and Joshua M. Glasser, LABATON KELLER SUCHAROW LLP, New York, New York; D. Seamus Kaskela and Adrienne Bell, KASKELA LAW LLC, Newtown Square, Pennsylvania *Attorneys for Plaintiffs*.

Brian C. Ralston and Charles R. Hallinan, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Andrew R. Gray, Ryan A. Walsh, and Natasha Pardawala, LATHAM AND WATKINS LLP, Costa Mesa, California, *Attorneys for Defendants Robert Antokol and Craig Abrahams.*

R. Judson Scaggs, Jr., Susan W. Waesco, and Kirk C. Andersen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL:

Dean Kristy FENWICK & WEST LLP, San Francisco, California; Felix S. Lee, FENWICK & WEST LLP, Mountain View, California, *Attorneys for Defendant Playtika Holding UK II Limited*

**GLASSCOCK, Vice Chancellor**

This Memorandum Opinion is a follow-up to my bench ruling on February 7, 2024,[1] where I addressed—and denied—Defendant Playtika Holding UK II Ltd.'s Motion to Dismiss.[2] This Memorandum Opinion resolves Defendants' Robert Antokol and Craig Abrahams (the "Individuals Defendants") Motion to Dismiss.[3]

Briefly, Antokol and Abrahams are fiduciaries for a Delaware corporation, nominal Defendant Playtika Holding Corp. ("Playtika"). Playtika is a controlled company. The majority of Playtika stock is held by Defendant Playtika Holding UK II Limited ("Giant/Alpha"). The Complaint alleges that Giant/Alpha itself faced a liquidity crisis in 2021 and sought to raise funds by a potential sale of its stock, to non-party Joffre Capital. Giant/Alpha's action caused market confusion, and Playtika's board established a special committee (the "Special Committee") to consider strategic alternatives.

After the Joffre sale failed to materialize, Giant/Alpha used its controlling position to cause the Playtika Board to engage in a self-tender, which addressed Giant/Alpha's liquidity crisis; the tender offer, at Giant/Alpha's insistence, also contained a "safety valve," a device whereby Giant/Alpha could monitor the number of shares tendered and manipulate its own tender to maintain control of Playtika. In

[1] Tel. Partial Rulings of the Ct. on Defs.' Mot. to Dismiss the Verified Class Action Compl. ("Bench Ruling"), Dkt. No. 47.
[2] Def. Playtika Hldg. UK II's Mot. to Dismiss, Dkt No. 14.
[3] Defs. Robert Antokol's and Craig Abrahams' Mot. to Dismiss the Verified Class Action Compl., Dkt. No. 16.

other words, Giant/Alpha extracted a non-ratable benefit from the tender offer. I found that the standard of review, in the circumstances alleged, was entire fairness, and denied Giant/Alpha's motion to dismiss under Rule 12(b)(6).[4] I reserved ruling on Antokol and Abrahams' Motion to Dismiss. The Complaint alleges two grounds to find breach of fiduciary duty against the Individual Defendants: (i) that they approved the unfair tender offer; and (ii) that they engaged in "unauthorized communications" with Giant Alpha and Joffre, in violation of guidelines adopted by the Special Committee—this presumably frustrated the work of the Special Committee.[5]

This Memorandum Opinion contains facts only necessary to my analysis. The facts come from the Complaint and are presumed true at this pleadings stage. I address the facts pertaining to Plaintiffs' remaining claims below, and my analysis follows. Briefly, the Individual Defendants are officers—employees—of Playtika; as such, I may infer that they are not independent from the controller. Nonetheless, I find that the Complaint fails to allege non-conclusory facts that, if true, support an inference that these Defendants have breached fiduciary duties owed to Playtika. The Motion to Dismiss is granted accordingly.

---

[4] For reasons not pertinent here, I also found *in personam* jurisdiction over Giant/Alpha.
[5] Verified Class Action Compl. ¶ 193, Dkt. No. 1 ("Compl.").

# I. BACKGROUND

## 1. The Parties

Playtika is a video game developer, incorporated in Delaware and headquartered in Israel.[6]

Giant/Alpha is a consortium of investors that acquired Playtika in 2016.[7] Giant/Alpha then transferred 100% of its Playtika common stock to a wholly owned Giant/Alpha subsidiary, Playtika Holding UK II Limited ("Holding," and in concert with Giant/Alpha, "Giant/Alpha"),[8] which—post an initial public offering—controls a 56.3% voting interest in Playtika. Holding is incorporated in England and Wales.[9]

Defendant Robert Antokol is a co-founder of Playtika and CEO and Chairs the Board.[10] Playtika's April 28, 2022 Definitive Proxy Statement does not identify Antokol as an "independent director."[11]

Defendant Craig Abrahams is Playtika's President and CFO.[12]

---

[6] Compl. ¶ 19.
[7] Id. ¶ 15.
[8] The Complaint tends to refer to Giant/Alpha and its wholly-owned subsidiary Holding interchangeably. For purposes of this Memorandum Opinion, I follow the convention of the Complaint and Plaintiffs' briefing, although ultimately the separate corporate forms may be material.
[9] Compl. ¶ 15.
[10] Id. ¶ 16.
[11] Id.
[12] Id. ¶ 17.

## 2. *Facing a Liquidity Crisis, Giant/Alpha Looks to Playtika for a Resolution*

In the fall of 2021, Giant/Alpha faced an impending liquidity crisis—with $700 million in debt due by the end of June 2022 and more than $2 billion due by the end of 2022.[13] Giant/Alpha approached Playtika seeking to sell down its Playtika stock.[14] Playtika's banker/advisor, The Raine Group, ("Raine") made a presentation to the Playtika Board, arguing that a sale would be beneficial for Playtika, and the Board authorized management to help facilitate a stock sale by Giant/Alpha.[15] On January 24, 2022, Playtika and Giant/Alpha issued a press release publicly disclosing that Holding was contemplating a sale of Company stock consisting of approximately 15% to 25% of the total shares outstanding.[16]

During this time, Giant/Alpha received an indication of interest from Joffre Capital ("Joffre"), a private equity firm, to acquire 55% of Playtika's outstanding shares for $27.00 per share from Giant/Alpha.[17] This offer, however, would trigger expensive change in control payments for the Company, and management told the Board it did not think Joffre's initial interest would be feasible.[18] On February 23, 2022, the Board met and concluded that Giant/Alpha's efforts were causing market

---

[13] *Id.* ¶ 7.
[14] *Id.* ¶ 34.
[15] *Id.* ¶ 38.
[16] *Id.* ¶ 39.
[17] *Id.* ¶¶ 5, 40.
[18] *Id.* ¶¶ 41–42.

confusion.[19] As a result, the Board decided to form a special committee (the "Special Committee") to consider options, which also included a sale of the Company.[20]

### 3. Giant/Alpha Acts Without the Special Committee's Oversight

In February 2022, before the Special Committee was formed, Raine contacted 36 potential buyers and set a firm and aggressive March 7, 2022 deadline for initial bids.[21] On February 7, 2022, the Playtika Board met to discuss an update on Giant/Alpha's potential stock sale, and during that meeting the Playtika Board retained Raine as its financial advisor in connection with any transaction.[22] After the formation of the Special Committee, Giant/Alpha continued to have discussions with potential buyers for its stock, without the Special Committee's knowledge.[23]

On March 8, 2022, the Special Committee met to discuss the Company's strategic review process and became aware that Giant/Alpha was conducting a parallel process regarding a sale of all or a portion of its Playtika holdings, due to its liquidity needs.[24]

At the Special Committee's March 11th meeting, Raine disclosed its direct engagement with potential counterparties and shared that potential bidders were aware that Giant/Alpha's liquidity needs had caused an expedited timeline of a

---

[19] *Id.* ¶ 43.
[20] *Id.*
[21] *Id.* ¶ 45.
[22] *Id.* ¶ 40.
[23] *Id.* ¶¶ 69–70.
[24] *Id.* ¶ 52. The Complaint does not specify who informed the Special Committee.

potential transaction.[25]  On March 15, 2022, the Special Committee met again,  and Raine relayed that Giant/Alpha continued its independent outreach to third parties and potential counterparties were finding Giant/Alpha's proposed timeline "very challenging."[26]  During this meeting, the Special Committee members expressed concern that they were operating without material facts regarding Giant/Alpha's liquidity needs.[27]  Throughout the process, bidders continued to express to Raine exasperation about timeline challenges,[28] and some even decided not to pursue their offer further.[29]

As a result, process guidelines were drafted, which were designed to provide the Special Committee with more control over the process and limit Giant/Alpha's ability to act without Special Committee oversight.[30]  The guidelines provided that Giant/Alpha would need to coordinate with and keep the Special Committee informed.[31]  The guidelines also required management to keep the Special Committee informed and not participate in any discussions concerning their own compensation or other unique interests.[32]  Specifically, on March 25, 2022, the

---

[25] *Id.* ¶ 62.
[26] *Id.* ¶ 66.
[27] *Id.* ¶ 68.
[28] *Id.* ¶¶ 72, 90.
[29] *Id.* ¶ 85.
[30] *Id.* ¶ 75.  The passive voice here is intentional, if unhelpful; the Complaint does not specify who drafted and provided the guidelines to the Special Committee.
[31] *Id.* ¶ 76.
[32] *Id.* ¶ 77.

Special Committee met to discuss Giant/Alpha's response to the guidelines, with Giant/Alpha expressing its reluctance to allow the Special Committee to run the process.[33] Giant/Alpha, thereafter, continued to have unauthorized discussions with bidders.[34] Raine informed the Special Committee during the meeting that "many potential counterparties were requesting detailed information regarding marketing spending by channel that management was 'unwilling' to provide given its 'competitively sensitive' nature."[35]

Despite the creation of the guidelines, the timeline for the process continued to be structured around Giant/Alpha's liquidity needs, which could potentially suppress offers for the Company.[36] Consequently, the Special Committee directed its advisors to press Giant/Alpha for more information about its liquidity needs.[37] Giant/Alpha generally acknowledged to the Special Committee its need for liquidity on April 20, 2022.[38] In the meantime, the Special Committee evaluated another offer, but the bidder proposed six transaction structures, all of which only served to benefit Giant/Alpha at the expense of the Company and its stockholders.[39] The

---

[33] *Id.* ¶ 79.
[34] *Id.* ¶ 78.
[35] *Id.* ¶ 80. The Complaint does not specify which individuals constitute the "management," presumably Playtika's executives, to whom it refers.
[36] *See id.* ¶ 62.
[37] *Id.* ¶ 91.
[38] *Id.* ¶ 94
[39] *Id.* ¶ 100.

Special Committee continued to explore its options.[40] On May 23, 2023, Raine reported to the Special Committee certain specifics regarding Giant/Alpha's upcoming debt maturities, which totaled to $3.05 billion.[41]

The Special Committee met on June 14, 2022, and was informed[42] that Giant/Alpha refused to engage with two companies because the proposed purchase price was inadequate.[43] Abrahams then reported on conversations (which the Complaint identifies as "unauthorized") he and Giant/Alpha had with Joffre.[44] After that conversation, Antokol relayed to the Special Committee that Joffre and Giant/Alpha had reached a deal where Joffre would purchase 35% of the total outstanding shares at an initial purchase price of $14 per share with subsequent payments to bring that to $21 per share.[45] Thereafter, non-party Bing Yuan, a director of Playtika, reported that a Giant/Alpha representative contacted him to reiterate: "(i) Giant/Alpha's urgent liquidity needs; (ii) it had no interest in agreeing to a deal with any of the other bidders at the prices proposed and further discussions with them are futile; and (iii) Giant/Alpha still wanted the Company to conduct a self-tender that would deliver it $300 million in proceeds."[46]

---

[40] *Id.* ¶¶ 103–19.
[41] *Id.* ¶¶ 120–21.
[42] *See* n. 26, *supra.*
[43] *Id.* ¶ 129. The Complaint does not specify by whom.
[44] *Id.* ¶ 130.
[45] *Id.* ¶ 131.
[46] *Id.* ¶¶ 132, 31.

8

As a result, the Special Committee stopped engaging with bidders with submitted proposals and requested information from Giant/Alpha concerning: (i) its perspective of a tender offer and (ii) the status of negotiations with Joffre.[47]  At a later Special Committee meeting, on June 16, 2022, Defendant Abrahams disclosed that Antokol had spoken to Joffre's managing partner, who claimed to have secured financing for a purchase of 25% of Playtika's shares at $21 per share.[48]  The Special Committee discussed its options in the event Joffre and Giant/Alpha reached a deal and continued to discuss potential tender offer terms and their implications.[49]  On June 21, 2022, Giant/Alpha revealed to the Special Committee that it lacked liquidity to cover debt maturities due on June 30, 2022, and still wanted the Company to launch a self-tender offer.[50]

The Special Committee next met on June 24, 2022, and Abrahams reported that Antokol, Joffre, and Giant/Alpha were still having discussions about a private deal.[51]  Specifically, Joffre sent Giant/Alpha a $15 million deposit during negotiations of a stock purchase agreement.[52]  Giant/Alpha, however, still insisted that the Company pursue a self-tender offer regardless of the outcome of its

---

[47] *Id.* ¶ 133.
[48] *Id.* ¶ 135.
[49] *Id.* ¶ 137.
[50] *Id.* ¶ 140.
[51] *Id.*
[52] *Id.*

9

discussions with Joffre.[53]   During this time, other bidders indicated they could potentially amend their proposals, but the Special Committee decided not to engage with them because it assumed that Giant/Alpha would veto those deals.[54]

### 4. The Joffre Deal Fails and Giant/Alpha and Playtika Effectuate the Self-Tender Offer and Giant/Alpha Remains the Controlling Stockholder

On June 27, 2022, Giant/Alpha and Joffre entered into a Stock Purchase Agreement ("SPA") with an affiliate of Joffre, but it became apparent the deal would not solve Giant/Alpha's liquidity needs, as the SPA had a closing date which would not immediately solve Giant/Alpha's debt crisis.[55]  Thus, Giant/Alpha and Playtika continued discussions about a self-tender offer.[56]   Giant/Alpha successfully negotiated a "safety valve" mechanism with Playtika, which would allow Playtika to announce the number of tendered shares publicly; a provision that would appear in the self-tender offer agreement (the "Tender Agreement").[57]  Specifically, Section 2.1(b) of the Tender Agreement required the Company to disclose to Giant/Alpha the number of shares tendered in the tender offer by all other stockholders.[58] The provision also permitted Giant/Alpha to withdraw shares as necessary to maintain

---

[53] Id.

[54] Id. ¶ 141.

[55] Id. ¶¶ 147, 162.  Although the SPA was executed between Joffre and Giant/Alpha, the deal it was not consummated.  Id. ¶¶ 149, 162.

[56] Id. ¶¶ 163–68.

[57] Id. ¶ 169.

[58] Id.; Exs. A - B to Transmittal Aff. of R. Judson Scaggs, Jr. in Supp. of Def. Playtika Hldg. UK II's Opening Br. in Supp. of Its Mot. to Dismiss, Ex. B. 3–4, Dkt. No. 15.

its control of the Company. This mechanism effectively gave Giant/Alpha the ability to monitor all shares tendered during the tender offer, giving it the ability to maintain its status as controlling stockholder of Playtika.[59] In my bench decision, I found this conferred a non-ratable benefit on the controller.[60]

On August 22, 2022, the Special Committee approved a $600 million self-tender at $11.58 per share featuring the "safety valve" that Giant/Alpha requested.[61] Two days later, on August 24, 2022, the Board passed resolutions approving the self-tender.[62] Antokol, and non-parties Tian Lin, head of investments for a Giant/Alpha affiliate; and James Fu Bin Lu, a board member appointed by Joffre pursuant to the SPA, were present, but recused themselves from the vote.[63] On August 26, 2022, Playtika and Giant/Alpha entered into the Tender Agreement, and at the conclusion of the self-tender offer, Giant/Alpha remained the controlling stockholder.[64]

## II. ANALYSIS

The Individual Defendants have moved to dismiss the claims under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate

---

[59] *Id.* ¶ 169.
[60] Bench Ruling 17:9–17.
[61] *Id.* ¶ 176.
[62] *Id.* ¶ 177.
[63] *Id.*
[64] *Id.* ¶¶ 178–79.

11

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[65]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[66] In addition, I refer to certain documents that are incorporated by reference in the Complaint.[67]

Plaintiffs allege that Defendants breached their fiduciary duties by approving the allegedly unfair self-tender, which perpetuated Giant/Alpha's control of the Company.[68] The Complaint notes that Antokol, as a conflicted director, recused himself from the vote but was present at the meeting at which the board approved the Special Committee's recommendation of the self-tender offer.[69] Plaintiffs also allege that Antokol and Abrahams breached their duties of loyalty by advancing the interests of the controlling stockholder through unauthorized and unsupervised discussions, in violation of the Special Committee's guidelines, which inhibited the Special Committee's ability to pursue value-maximizing efforts, effectively forcing the Company to create the self-tender offer with Giant/Alpha.[70]

---

[65] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[66] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (internal quotation marks omitted).

[67] *Id.* at 873 (quoting *Vanderbilt Income & Growth Assoc., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

[68] Pls.' Corrected Omnibus Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Class Action Compl. 58 ("PL AB"), Dkt. No. 34.

[69] *Id.* at 59–60.

[70] *Id.* at 58–59.

### 1. Plaintiffs Have not Pled Allegations Sufficient to a Claim of Breach of a Fiduciary Duty Against Abrahams

I turn first to the allegations pled pertaining to Defendant Abrahams. Abrahams was an Officer of Playtika and thus owed duties of loyalty and care to Playtika.[71] Pertinent here, he owed a duty to act with complete loyalty to the company, and not its controller. I may also assume that, as an employee of Playtika, Abrahams (like Antokol, the CEO) was not independent of Playtika's controller, Giant/Alpha. Plaintiff's first contention is that Abrahams "approved" the conflicted transaction, the Tender Offer.[72] But Abrahams was not a director of Playtika, and this claim does not lie.

Remaining are the allegations of "unauthorized" communications with Giant/Alpha and Joffre.[73] But the assertion that communications were unauthorized is purely conclusory, and contrary to the record.

The Complaint recites that the Board instructed "management"—presumably including Abrahams and CEO Antokol—to assist Giant/Alpha with a sale of its shares.[74] Plaintiffs suggest that Abrahams actions violated or "skirted" the Special Committees guidelines, subsequently adopted, as directed to management. Those

---

[71] Plaintiffs are cagey regarding fiduciary duties; they never make entirely clear whether their claims against the Individual Defendants sound in a breach of fiduciary duty of loyalty or care. The allegations themselves lend credence only to loyalty claims, and I evaluate the motion before me accordingly.

[72] Compl. ¶ 193.

[73] *Id.* ¶ 129.

[74] *Id.* ¶ 38.

guidelines, however, are limited to a duty to report any substantive communications from any proposed transaction parties to Raine; a provision that management could participate with Raine in conversation with such parties but could not independently "initiate contact" without the permission of the Special Committee or Raine; and a prohibition of discussion by management of post-transaction employment or compensation without Special Committee approval.[75]

In short, the Complaint simply makes allegations of "unauthorized" communications by Abrahams; without more, this does not state a claim.

I find Vice Chancellor Laster's post-trial decision in the entire fairness scenario instructive by contrast. In *In re Dole Food Company Stockholder Litigation,*[76] the plaintiffs brought claims concerning a merger, which the Court held was an unfair, self-interested transaction, effectuated and orchestrated by the controlling stockholder.[77]

The plaintiffs also brought a breach of duty of loyalty claim against an officer-director defendant who served as the company's president, chief operating officer, and general counsel.[78] At trial, the record demonstrated that this defendant acted primarily in his capacity as an officer when he (i) provided false information to a

---

[75] *Id.* ¶ 77.
[76] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015).
[77] *Id.* at *26–39.
[78] *Id.* at *40.

14

special committee created to negotiate the transaction at arms-length; (ii) convened and led a secret meeting with the controller's bankers and the company's management; (iii) insisted on having control over the company's confidential information; (iv) provided legal and strategic advice to the controller, among other actions that undermined the efforts of the special committee to the benefit of the controller.[79] No such allegations are in the Complaint here, by contrast.

I also find that Vice Chancellor Zurn's memorandum opinion on a motion to dismiss supports my analysis here. In *In re Pattern Energy Group Inc., Stockholder Litigation*, an investor exercised extensive control over a company and favored a proposed merger, which furthered his goal of taking the company private and consolidating it with an entity he owned.[80] The plaintiff brought claims challenging the merger, including a breach of fiduciary duty of loyalty against officer-defendants.[81]

On a motion to dismiss, these officer-defendants were found to lack independence from the investor.[82] Nonetheless, the court found that the plaintiff had failed to plead facts regarding two officer-defendants sufficient to infer that they acted during the transaction process in furtherance of to those conflicted interests;

---

[79] *Id.*
[80] 2021 WL 1812674, at *46 (Del. Ch. May 6, 2021).
[81] *Id.* at *1–2.
[82] *Id.* at *68.

15

the complaint referred to officer-defendants collectively, without specific allegations as to their individual conduct, and further alleged only actions that the court found were consistent with their duties as officers.[83]

Similar to *In re Pattern,* the Complaint here is devoid of well-pled allegations, or facts from which I may reasonably infer actions, by Abrahams taken to the detriment of the company. The Complaint states that management was charged by the Board with assisting Giant/Alpha in its attempt to sell some of its stock and provides that Abrahams regularly reported to the Special Committee as to his and Antokol's activities regarding discussions with Giant/Alpha and Joffre.[84] The Individual Defendants' actions were not cryptic or undisclosed to the Committee. The Complaint is devoid of any indication that the Special Committee complained that either Defendant had "skirted" its guidelines. The Complaint notes that Abrahams consistently reported his and Antokol's contacts with Giant/Alpha and Joffre but is silent as to any direction from the Special Committee to halt or limit such discussions. The Complaint also lacks sufficient allegations that either Defendant interfered in such a way with the Special Committee's process so to undermine the Special Committee's ability to negotiate on a fully informed basis. The Complaint simply states Abrahams and Antokol engaged in communication

---

[83] *Id.* at *68–69.
[84] Compl. ¶¶ 129, 135, 140.

16

with the controller and Joffre. The mere occurrence of communications outside of the Special Committee's purview, combined with a conclusory allegation that the communications were "unauthorized"—even crediting the allegations of an unfair transaction—are insufficient, under the facts here, to support an inference that the Individual Defendants breached their fiduciary duty.

The Complaint also points out that, early in the process, Raine reported to the Special Committee that potential counterparties were requesting information that "management" was reluctant to give,[85] but the record does not provide that Individual Defendants or other members of management were instructed (by the Special Committee or otherwise) to provide specific information, and Plaintiffs do not explain how this failure to provide information could support an allegation of breach of fiduciary duty. In other words, Abrahams was told by the Board to facilitate a sale of Giant/Alpha's stock. He did so, reporting regularly to the Special Committee, but the stock sale was not consummated. Even with the plaintiff-friendly inferences which I must apply, I do not find it reasonably conceivable, based on the facts pled, that Abrahams violated a fiduciary duty regarding the pre-self-tender negotiations.

---

[85] *Id.* ¶ 80.

## 2. Plaintiffs Have Not Pled Allegations Sufficient to a Claim for Breach of a Fiduciary Duty Against Antokol in his Capacity of an Officer or Director

I now turn to the allegations pled regarding Antokol. Antokol, as the Playtika CEO and Chair of the Board of Directors, owed fiduciary duties to Playtika. His contact with Giant/Alpha and Joffre during the sales attempt was more extensive than was Abrahams';[86] nevertheless, the allegations against him fail for the same reasons stated above. The Board tasked management with helping Giant/Alpha sell its stock, which Antokol presumably did;[87] the Special Committee is not alleged to have informed Antokol that it saw his activities as harmful or outside of its guidelines; and there are no non-conclusory allegations that Antokol's actions—as opposed to those of Giant/Alpha itself—frustrated the Special Committee's purpose to negotiate on a fully informed basis.[88] Even in a transaction with a controller present, for a claim breach of duty of loyalty to survive I must infer that Antokol was not independent of the controller (which I do) *and* worked to advance the controller's interest in detriment to Playtika.[89] The facts pled are not sufficient to support the latter inference.

---

[86] *Id.* ¶¶ 129, 135, 140.
[87] *Id.* ¶ 38.
[88] *In re Dole Food Co.,* 2015 WL 5052214, at *38.
[89] *Id.* at *39–40.

18

Antokol is also charged with disloyally approving the conflicted self-tender.[90] Unlike non-director Abrahams, Antokol is a member of the Board of Directors.[91] After the Board was informed that Giant/Alpha intended to sell some of its stock, Raine advised the Board that it was in Playtika' interest that a sale occur.[92] The Board instructed management to facilitate the sale. Once the Board was convinced that the potential sale was causing market confusion, it set up a Special Committee to evaluate any transaction, and the Board agreed not to go forward without approval of the Special Committee.[93] Ultimately, the Special Committee recommended the self-tender.[94] The Board approved the self-tender. Antokol, however, recused himself and did not vote on the self-tender.[95] The Complaint is entirely silent as to any involvement of Antokol (or Abrahams) in structuring the self-tender and its problematic "safety valve." These facts, to my mind, do not state a loyalty breach.

It is with some reluctance that I dismiss these claims. My reluctance, however, stems from the fact the controller pursued its own interests (as it had a right to do), in a way that allegedly frustrated the Special Committee's attempt to evaluate alternative transactions, and that Antokol, a Playtika fiduciary, was involved in Giant/Alpha's efforts, which led, ultimately, to the allegedly-unfair self-tender.

---

[90] *Id.* ¶ 193.
[91] *Id.* ¶ 16.
[92] *Id.* ¶ 36.
[93] *Id.* ¶ 43.
[94] *Id.* ¶ 176.
[95] *Id.* ¶ 177.

19

Plaintiffs have, in my view, failed to state a claim against the Individual Defendants. If the record develops in such a way that it becomes clear that breach of duty claims exist against these Defendants, Rule 15(aaa) is a bar to further proceedings against them.[96]  I make no determination here whether the good-cause "safety valve" (to coin a phrase) embodied in the doctrine of law-of-the-case might give relief to the stockholder class in such an occurrence. [97]

### III. CONCLUSION

For the forgoing reasons, the Individual Defendants' Motion to Dismiss is GRANTED.  The parties should provide an appropriate form of order embodying this decision together with my Bench Decision denying the Motion to Dismiss of Giant/Alpha.

---

[96] Ct. Ch. R. 15(aaa).

[97] *See generally*, *In re P3 Health Grp. Hldgs., LLC*, 2022 WL 15026696 (Del. Ch. Oct. 27, 2022).